# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 22, 2024

Lyle W. Cayce
Clerk

———————

No. 23-10284

———————

Adis Kovac; Bashar Aljame; Abraham Sbyti; Suhaib Allababidi; Fadumo Warsame,

*Plaintiffs—Appellants*,

*versus*

Christopher Wray, *Director of the Federal Bureau of Investigation, in his official capacity*; Charles H. Kable, *Director of the Terrorist Screening Center, in his official capacity*; Deborah Moore, *Director, Transportation Security Redress (OTSR), in her official capacity*; Nicholas Rasmussen, *Director of the National Counterterrorism Center, in his official capacity*; David P. Pekoske, *Administrator Transportation Security Administration (TSA), in his official capacity*; Kevin K. McAleenan, *Acting Commissioner United States Customs and Border Protection, in his official capacity*,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CV-110

———————————————————

Before Barksdale, Southwick, and Graves, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

The Plaintiffs are a group of American citizens who complain they are subject to enhanced screening measures at airport security because they have

been placed on a "terrorist watchlist." They sued the heads of various federal agencies connected to the watchlist, asserting numerous constitutional and statutory claims. The sole issue on appeal is whether the relevant agencies have statutory authority to create, maintain, and administer the watchlist. At summary judgment, the district court determined the agencies have statutory authority. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs are five Muslims who are United States citizens, four of whom reside in Dallas, Texas, and the fifth resides in New Jersey. They allege they have been put on what is officially called the Terrorist Screening Dataset ("Watchlist"). The Watchlist contains two sub-lists: (1) the No-Fly List, which automatically excludes individuals from flying; and (2) the Selectee List, which contains individuals who are subject to "additional security screening" before they may be permitted to board. Four of the Plaintiffs allege they are on the Selectee List because they have been subject to enhanced screening on multiple occasions, including prolonged interrogations, border searches, and having "SSSS" printed on their boarding passes.[1] Plaintiff Adis Kovac alleges he is on the No-Fly List because he has been prevented from boarding a commercial flight and possibly the Selectee List because he is frequently subject to enhanced screening.

Each Plaintiff utilized the Department of Homeland Security's ("DHS") Traveler Redress Inquiry Program ("TRIP"). This program allows individuals who believe they have been improperly subjected to enhanced screening or prohibited from flying to obtain additional review of their

---

[1] The "SSSS" designation indicates that enhanced screening is required. This designation may appear on passengers' boarding passes because they are on the Selectee List, " random selection," or for "reasons unrelated to any status." *Ghedi v. Mayorkas*, 16 F.4th 456, 460 (5th Cir. 2021).

status and to correct any errors or to alter their status based on new information. *See* 49 C.F.R. §§ 1560.201, .205. Because of security concerns, the Government's policy is to neither confirm nor deny a person's Selectee List status; those on the No-Fly List will be apprised of their status and may obtain judicial review. 49 U.S.C. § 46110. As a result, the Selectee List Plaintiffs received no-confirm-no-deny letters from DHS. DHS confirmed, however, that Plaintiff Kovac was on the No-Fly List.[2]

In January 2017, the Plaintiffs sued the heads of various federal agencies that maintain or use the Watchlist, in their official capacities (collectively, "Government").[3] The Plaintiffs allege violations of their Fifth Amendment procedural and substantive due process and equal protection rights, unlawful agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and violations of the nondelegation doctrine. On the Government's motion to dismiss, the district court dismissed all claims against CBP for failure to prosecute, the substantive and procedural due process claims in part, the equal protection claims, and the nondelegation claims against all Defendants. *See Kovac v. Wray*, 363 F. Supp. 3d 721, 747–48, 762–63 (N.D. Tex. 2019) ("*Kovac I*"). In July 2019, Plaintiff Kovac was notified that he was removed from the No-Fly List, and the district court dismissed his related claims as moot. *Kovac v. Wray*, 449 F. Supp. 3d 649, 654–56 (N.D. Tex. 2020) ("*Kovac II*"). In November 2020, the district court dismissed the Plaintiffs' remaining constitutional claims, leaving only the

---

[2] When the Plaintiffs filed their complaint, DHS had yet to respond to Kovac's TRIP request. This confirmation came in April 2018.

[3] The agencies include: the Federal Bureau of Investigation ("FBI"), the Terrorist Screening Center ("TSC"), the Transportation Security Administration ("TSA"), DHS, the National Counterterrorism Center ("NCTC"), and the Customs and Border Protection ("CBP").

No. 23-10284

APA claims. *Kovac v. Wray*, No. 3:18-CV-110, 2020 WL 6545913, at *5 (N.D. Tex. Nov. 6, 2020) ("*Kovac III*"). None of those decisions are before us.

At summary judgment on the APA claims, the Plaintiffs argued both that the major questions doctrine applies in this case and that the Government exceeded its authority because Congress never clearly authorized the Watchlist. The Government's actions against the Plaintiffs, therefore, violated 5 U.S.C. § 706(2)(C). They also asserted their alleged placement on the Selectee List was arbitrary and capricious. § 706(2)(A). Finally, they maintained the TRIP process is arbitrary and capricious because it does not provide a meaningful opportunity to correct erroneous information and distinguishes between the No-Fly and Selectee Lists. *Id.*

The district court agreed that the major questions doctrine applied because of the Watchlist's "vast political significance." *Kovac v. Wray*, 660 F. Supp. 3d 555, 563–65 (N.D. Tex. 2023) ("*Kovac IV*"). Nevertheless, the court concluded that Congress "clearly authorized" the Watchlist by analyzing numerous factors, only some of which pertained to the relevant statutes. *Id.* at 565–69. The court further determined that, even if the Plaintiffs had been placed on the Watchlist,[4] the TRIP procedures were not arbitrary and capricious. *Id.* at 569–72. The Plaintiffs timely appealed.

## DISCUSSION

We review the grant of summary judgment *de novo*, "applying the same standard as the district court." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 943 (5th Cir. 2019) (citation omitted). Summary judgment should be granted "if the movant shows that there is no genuine dispute as

---

[4] The district court emphasized that "[n]othing in this opinion should be construed as confirming or denying the [Plaintiffs'] status on or off the [W]atchlist." *Id.* at 569 n.85. Similarly, our opinion neither confirms nor denies the Plaintiffs' status.

to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Issues of statutory interpretation are also reviewed *de novo*." *United States v. Arrieta*, 862 F.3d 512, 514 (5th Cir. 2017) (italics added). "This [c]ourt may affirm on grounds other than those relied upon by the district court" when supported by the record. *Lauren C. ex rel. Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018) (citation omitted).

The sole issue on appeal is whether the Government has statutory authority to create, maintain, and use the Watchlist to screen passengers boarding commercial aircraft. If we answer in the negative, then we must "hold unlawful and set aside" the Government's actions regarding the Watchlist as they relate to the Plaintiffs. 5 U.S.C. § 706(2)(C); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("In addition to prescribing procedures for agency action, the APA delineates the basic contours of judicial review of such action." (citing 5 U.S.C. § 706)).

### I.    *Statutory interpretation and the major questions doctrine*

The district court started its analysis with the major questions doctrine and concluded that the doctrine applies because "the [W]atchlist has vast political significance." *Kovac IV*, 660 F. Supp. 3d at 565. As support, the district court explained the Watchlist "consists of over a million people," the Government may add "an unlimited number of people" to it, "liberty intrusions . . . flow from the [W]atchlist," and the Watchlist can be distributed between federal and state agencies in numerous ways. *Id.* After applying its understanding of the elements of the doctrine, the district court determined that the Government acted properly. *Id.* at 565–69.

We conclude that the district court should have started with the relevant statutory texts, not with the doctrine about major questions. "[S]tatutory interpretation must begin with, and ultimately heed, what a statute

actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (quotation marks and citation omitted). The analysis ends with the statutory text "if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Only when there is ambiguity should other analytical steps be taken. *See, e.g.*, *Vitol, Inc. v. United States*, 30 F.4th 248, 253 (5th Cir. 2022). Consequently, before proceeding to the major questions doctrine, courts must first examine the statutory text to discern if it is ambiguous as to the Government's asserted authority. *See West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022). We now examine the statutory text.

## II.    *Statutory text, structure, and history*

Before exploring the dense statutory landscape of this case, we identify what we are looking for. The Plaintiffs' principal statutory discussion pertains to TSA's authority under 49 U.S.C. §§ 114 and 44903. They describe these statutes as "so vague as to barely warrant discussion." The Plaintiffs' primary contention is that TSA's statutory obligation to protect airline passengers is not specific enough to authorize use of the Watchlist. Where the statute is more specific, they argue it is still not enough because it does not mention the word "watchlist." *See* 49 U.S.C. § 114(h). Even if TSA is authorized to use the Watchlist, the Plaintiffs maintain "TSA does not create, administer, or maintain the [W]atchlist," and the entity that does, TSC, lacks statutory authority to do so. As to the other agencies, the Plaintiffs argue that statutes authorizing their general law-enforcement duties do not confer sufficient authority to create, maintain, and use the Watchlist. *See* 28 U.S.C. § 533; 6 U.S.C. §§ 111, 202; 19 U.S.C. § 482 *et seq.*

Of course, statutes cannot be viewed in isolation, and statutory interpretation requires considering the context and structure of the overall statutory scheme. *West Virginia*, 597 U.S. at 721. Our analysis, therefore, goes

beyond the isolated statutes the Plaintiffs identify. As we go, we will highlight where the Plaintiffs' arguments falter.

### a.    Aviation and Transportation Security Act

Immediately following the September 11, 2001, terrorist attacks, Congress created TSA and included in its duties the oversight of passenger screening operations at domestic airports. Aviation and Transportation Security Act, Pub. L. No. 107-71, § 101, 115 Stat. 597 (2001) (codified at 49 U.S.C. § 114). Congress instructed TSA to "enter into memoranda of understanding with Federal agencies . . . to share or otherwise cross-check as necessary data on individuals identified on Federal agency *databases* who may pose a risk to transportation or national security." § 101(h)(1) (codified at 49 U.S.C. § 114(h)(1)) (emphasis added). Congress mandated TSA use information from government databases "to identify individuals on passenger lists" that may pose a threat and, if necessary, "prevent the individual from boarding an aircraft." § 101(h)(3) (codified at 49 U.S.C. § 114(h)(3)). Congress also required TSA to adopt "enhanced security measures" to "aid in the screening of passengers . . . who are identified on any State or Federal security-related *data base*" and to coordinate amongst airport security forces. § 109(a)(5) (codified at 49 U.S.C. § 114 note (Enhanced Security Measures)) (emphasis added). TSA assesses security threats "jointly" with the FBI. 49 U.S.C. § 44904(a).

Thus, the statutory authority for TSA to collect, share, and screen identifying information about airline passengers, and to use that information to prevent certain passengers from boarding or to conduct enhanced screening, is clear. They are not vague as the Plaintiffs argue. The Plaintiffs protest, however, that Section 114 does not use the word "watchlist." That word will come, but it is worth noting the term "terrorist watchlist" is only the common term for the Watchlist. Its official name is the Terrorist Screening

*Dataset*, and it was previously named the Terrorist Screening *Database*. Those words appear in Section 114(h) and its accompanying note, and similar variations of those words are common in the overall scheme. We now return to that discussion.

### b.   Homeland Security Act

In 2002, Congress recognized the need for "Federal, State, and local entities [to] share homeland security information to the maximum extent practicable." Homeland Security Act of 2002, Pub. L. No. 107-296, § 891(c), 116 Stat. 2135 (codified at 6 U.S.C. § 481(c)). Accordingly, Congress created DHS[5] and provided the President statutory authority to prescribe procedures by which "all appropriate agencies . . . shall . . . share "homeland security information" with appropriate Federal and State agencies and personnel.[6] § 892(b)(1) (codified at 6 U.S.C. § 482(b)(1)). These procedures applied to existing information-sharing systems and new ones that may be created. § 892(b)(2), (4) (codified at 6 U.S.C. § 482(b)(2), (4)). Congress also authorized DHS to access "broad categories of material, . . . electronic *databases*, or both," and to harmonize "relevant information *databases*" across federal agencies. §§ 201(d)(15)(A), 202(b)(1) (codified at 6 U.S.C. §§ 121(d)(12)(A), 122(b)(1)) (emphasis added). This is where the Plaintiffs' argument that DHS lacks clear statutory authority related to the Watchlist begins to fall apart.

---

[5] In doing so, Congress transferred TSA from the Department of Transportation to DHS. § 403(2) (codified at 6 U.S.C. § 203(2)).

[6] "[H]omeland security information" is defined as "any information possessed by a Federal, State, or local agency that — (A) relates to the threat of terrorist activity; (B) relates to the ability to prevent, interdict, or disrupt terrorist activity; (C) would improve the identification or investigation of a suspected terrorist or terrorist organization; or (D) would improve the response to a terrorist act." 6 U.S.C. § 482(f)(1).

c.    *HSPD-6 and the IRTPA*

Pursuant to the authority under the Acts discussed above, President Bush in 2003 signed Homeland Security Presidential Directive 6 ("HSPD-6"), which, along with an inter-agency memorandum of understanding, instructed the Attorney General to create the TSC under the administration of the FBI. HSPD-6 sought "to consolidate the Government's approach to terrorism screening" through the Terrorist Threat Integration Center ("TTIC"). President Bush later incorporated TTIC into the NCTC through an executive order. Exec. Order No. 13,354, 69 Fed. Reg. 53,589 (Aug. 27, 2004). The executive order directed the NCTC to create, integrate, disseminate, and ensure intra- and inter-governmental access to data and reports concerning terrorism information. *Id.*

In the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108-458, sec. 1021, § 119, 118 Stat. 3638 (codified as amended at 50 U.S.C. § 3056), Congress codified the NCTC and its duties and authority. Today, as then, one of the NCTC's duties is to "develop a strategy for combining terrorist travel intelligence" and law enforcement efforts to "intercept . . . and constrain terrorist mobility." Sec. 1021, § 119(f)(1)(F) (codified as amended at 50 U.S.C. § 3056(f)(1)(F)). To support the NCTC's efforts, the IRTPA authorized DHS to establish a program regarding terrorist travel, "including the *analysis, coordination, and dissemination* of terrorist travel intelligence and operational information" with relevant agencies, such as TSA and CBP. IRTPA § 7215 (codified at 6 U.S.C. § 123) (emphasis added); *see also* § 7201 (counterterrorist travel intelligence strategy). Congress further sought to enhance the Government's information-sharing structure by creating an "information sharing environment." § 1016 (codified at 6 U.S.C. § 485). This tool "facilitates the means for *sharing* terrorism information" with relevant governmental entities, "connects *existing systems*," "ensures direct and continuous online electronic access to

information," and "builds upon *existing systems* capabilities" used by the Government. § 1016(b)(2) (codified at 6 U.S.C. § 485(b)(2)) (emphasis added).

The IRTPA also made significant changes to airport passenger screenings. Congress charged DHS and TSA to implement "advanced passenger prescreening" and specifically required the agencies "to assume the performance of . . . comparing passenger information to the automatic *selectee and no fly lists* and utilize all appropriate records in the consolidated and integrated *terrorist watchlist* maintained by the Federal Government in performing that function." § 4012(a)(1) (codified as amended at 49 U.S.C. § 44903(j)(2)(C)) (emphasis added). While TSA has such authority for domestic travel, CBP, as DHS's designee, has essentially the same authority for international arrivals. § 4012(a)(2)(B) (codified as amended at 49 U.S.C. § 44909(c)(6)); *see also* 72 Fed. Reg. 48,320 (Aug. 23, 2007) (final rule required under 49 U.S.C. § 44909(c)(6)). The IRTPA further required DHS to consult with TSC to establish procedures "for the collection, removal, and updating of data maintained, or to be maintained, in the *no fly* and *automatic selectee lists*." § 4012(a)(1) (codified as amended at 49 U.S.C. § 44903(j)(2)(E)(iii)) (emphasis added). Congress also instructed DHS to implement appeal procedures for those identified as a threat. *Id.* (codified as amended at 49 U.S.C. § 44903(j)(2)(G)).

Through the combined effects of HSPD-6 and the IRTPA, the Government's Watchlist authority begins to take shape. Along with statutorily directed inter-agency memoranda of understanding, HSPD-6 and the IRTPA created and codified, respectively, the TSC, TTIC, and NCTC and their roles and powers in creating, administering, and maintaining the Watchlist, building off existing systems with the goal of disseminating the information with appropriate agencies for more effective use. In doing so, Congress certainly imagined, indeed required, that an agency like TSC would do this

work. Contrary to the Plaintiffs' arguments, the agencies' authority is not solely derived from their general law enforcement statutes. We also see repeated invocation of the Plaintiffs' magic words — "watchlist" or "terrorist watchlist" — and specific directions to screen airline passengers against the "selectee and no fly lists." 49 U.S.C. §§ 44903(j)(2)(C), (E)(iii), 44909(c)(6). Although the Plaintiffs take issue with these words not appearing in *some* provisions that make up the statutory scheme, the provisions that *do* use the term cannot be ignored. *See Sturgeon v. Frost*, 577 U.S. 424, 438–39 (2016). And there is still more to come.

### d.    *9/11 Commission Act*

To further promote homeland security information sharing Congress enacted the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, sec. 501, 121 Stat. 266 (codified in scattered provisions of 6 U.S.C.). DHS was required to develop a homeland security advisory system and "integrate" and "standardize" terrorism and homeland security information for greater dissemination and access. Sec. 501, §§ 203, 204 (codified as amended at 6 U.S.C. §§ 124, 124a). DHS was further instructed to establish "a comprehensive information technology network architecture . . . that connects the various *databases* and related *information technology assets*" to "promote *internal information sharing*." Sec. 501, § 205 (codified as amended at 6 U.S.C. § 124b) (emphasis added). TSA was obligated to develop and distribute a "Transportation Security Information Sharing Plan" to enhance interagency coordination. 9/11 Commission Act § 1203(a) (codified at 49 U.S.C. § 114(t)).

To provide a means for passengers to contend "they were wrongly identified as a threat under the regimes utilized" by TSA, CBP, or other DHS entities, Congress codified more robust appeal and redress procedures than what was included in the IRTPA. § 1606(a) (codified at 49 U.S.C. § 44926).

It established the Office of Appeals and Redress and regulated the records, information, and handling of private information, such as requiring encryption and other security protections. *Id.* The Office of Appeals and Redress is required to furnish necessary information to TSA, CBP, and other DHS entities to "improv[e] their administration of the *advanced passenger pre-screening system* and reduce the number of false positives." *Id.* (codified at 49 U.S.C. § 44926(b)(3)(B)) (emphasis added).[7]

The import of this Act is that based on the collective lessons learned from the September 11 terrorist attacks, Congress determined *more* terror-ism-related information sharing between appropriate agencies was necessary. Further, working from experience, Congress recognized that many people may be mistakenly swept under the broad authority it was conferring, so it provided more robust redress procedures for those affected. This seriously, if not fatally, undermines the Plaintiffs' argument that Congress never in-tended for relevant federal agencies to exercise such powers. It clearly did. Congress's more recent enactments confirm as much.

e.      *Further enactments*

The statutory scheme just described remains largely unchanged since its enactment. When Congress has modified parts of it, it has done so by reaffirming the Government's authority to maintain and use the Watchlist. For example, in the FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 1937, 132 Stat. 3186 (codified at 49 U.S.C. § 44919(j)), Congress codified TSA's PreCheck Program, which required participants to submit to "recur-rent checks against the *terrorist watchlist*." (emphasis added). In the same Act, Congress took significant steps towards applying the aviation passenger

---

[7] What resulted was DHS's TRIP, which we previously mentioned the Plaintiffs used.

vetting scheme to railroad passengers, including "vetting passengers using *terrorist watch lists* maintained by the Federal Government" or the TSA. § 1974(c)(1) (codified at 6 U.S.C. § 1164 note (Passenger Rail Vetting)) (emphasis added). Congress also amended the statute regulating grants to Amtrak so the corporation can "connect to the National *Terrorism Screening Center watchlist*" for enhanced security. § 1973(b)(1) (amending 6 U.S.C. § 1164(a)(3)(D)) (emphasis added); *see also* § 1973(a)(3) (amending 6 U.S.C. § 1163(b)(7)). In its brief, the Government notes other instances in which Congress directed agencies to maintain, disseminate, or use the Watchlist for security purposes, albeit not directly related to aviation passengers. 6 U.S.C. §§ 621(10), 622(d)(2), 488a(i)(2)(A), 1140, 1181(e)(2), 1162(e)(2); 49 U.S.C. §§ 44903(j)(2)(D), 44917(c)(2); 46 U.S.C. § 70105(a), (d).

"[G]uided to a degree by common sense," it is implausible to conclude that Congress would *expand* use of the Watchlist program if it truly believed it were unauthorized. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). That Congress's words became more specific over time does not undermine the agencies' prior authority, but rather confirms Congress intended to build on what already exists. *Id.* at 137–39.

\* \* \*

The foregoing demonstrates the Government's Watchlist authority rests on far more than vague authorizing statutes. Instead, the statutory scheme is highly complex and exists today after years of congressional enactments, presidential actions, and congressional ratifications and enhancements.

The Government suggests that another way to understand this array of statutory authorities is to view them as a stacked Venn diagram, wherein broader statutory authority encircle narrower ones. At its broadest level, Congress has authorized agencies like the FBI, DHS, and NCTC to collect,

investigate, and analyze terrorist-related intelligence. *See* 28 U.S.C. §§ 533, 534(a), 538; 6 U.S.C. § 121(d)(1), (12); 50 U.S.C. § 3056(d)(1). At the next, more specific level, Congress instructs these agencies, with direction from the President, to share and coordinate such intelligence with other federal agencies and state and local officials. *See* 6 U.S.C. §§ 122, 123(c)(4), 124, 124a(a), (c)(1), 124b, 126(a), 482(a)(1)(A), (b)(1), 485(b); 49 U.S.C. § 114(t). At the next, more specific level, Congress directs various agencies, including TSA and CBP, to screen persons against the shared and consolidated intelligence (*i.e.*, the Watchlist) in various situations. *See* 6 U.S.C. §§ 622(d)(2), 1162(e)(2), 1181(e)(2); 49 U.S.C. §§ 44903(j)(2), 44909(c)(6)(A), 44917(c)(2), 44919(j). Finally, at the most specific level that directly applies to this case, Congress requires TSA and CBP to coordinate with the TSC and commercial airlines to screen commercial airline passengers against the No Fly and Selectee Lists. 49 U.S.C. §§ 114(h), 44903(j)(2), 44909(c)(6).

Certainly, the Government has broad and detailed statutory authority to screen airline passengers. The Plaintiffs' arguments to the contrary therefore fail. We next consider the Plaintiffs' remaining arguments.

## III.   *Ratification*

To overcome the Government's clear statutory authority, the Plaintiffs argue Congress cannot authorize — or more properly perhaps, ratify — a previously unauthorized agency action. That is both factually and legally mistaken. It is factually mistaken because the Government's clear statutory authority existed at least six years before any alleged injury to the Plaintiffs, the earliest of which occurred in 2013. "Agency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity." *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016). It is legally mistaken because, even if the initial creation of individual agencies' lists prior to 2001 or 2004 were not authorized, Congress's ratification of their creation,

maintenance, and use would "give the force of law to official action unauthorized when taken." *Swayne & Hoyt v. United States*, 300 U.S. 297, 301–02 (1937). This is a long-settled principle.[8]

*IV.    Other Watchlist uses*

The Plaintiffs' final contention is that the relevant statutes do not authorize the entirety of the Watchlist program and its uses. Specifically, the Plaintiffs argue Congress never authorized the Government to maintain or administer the Watchlist for use in immigration proceedings, traffic stops, permitting, licensing, and firearm purchases. As a result, being on the Watchlist "ensnar[es] [the Plaintiffs] in an invisible web of consequences imposed indefinitely and without recourse." This, they say, makes the entirety of the Watchlist program beyond the scope of congressional authorization.

The fundamental reason the Plaintiffs' argument fails is they lack standing to raise it. The Plaintiffs bear the burden of demonstrating they satisfy the familiar Article III standing requirements of (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct and (3) will likely be redressable by a favorable opinion. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The alleged injury in fact must be both "concrete," meaning "it must actually exist," and "particularized," meaning "it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (quotation marks and citation omitted). Future injury may be sufficient for Article III standing, but the "threatened injury must be *certainly impending*"; "allegations of *possible*

---

[8] *See Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947); *Charlotte Harbor & N. Ry. Co. v. Welles*, 260 U.S. 8, 11–12 (1922); *Mattingly v. District of Columbia*, 97 U.S. 687, 690 (1878).

future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original) (quotation marks and citations omitted). Furthermore, "standing is not dispensed in gross"; "the right to complain of *one* administrative deficiency [does not] automatically confer[] the right to complain of *all* administrative deficiencies" from which the plaintiff has not been injured. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (emphasis in original).

Here, the Plaintiffs failed to show that they have suffered any adverse consequence unrelated to airport security resulting from their alleged placement on the Watchlist. The Plaintiffs are United States citizens, and their alleged injury is being subject to enhanced airport screenings because of their purported placement on the Watchlist. Any immigration consequences of their alleged placement, therefore, do not personally or concretely injure the Plaintiffs. *See Spokeo*, 578 U.S. at 339–40. Although it is possible the Plaintiffs could be injured if their alleged placement on the Watchlist adversely affects them during a traffic stop, firearm purchase, or license application, they have not demonstrated that such injuries have occurred or are "*certainly impending.*" *Clapper*, 568 U.S. at 409 (emphasis in original). Instead, the only personal injury they allege is having to undergo TSA's enhanced screenings at airport security and, in Plaintiff Kovac's case, being prevented from boarding a flight.

To avoid this conclusion, the Plaintiffs argue that "once an agency's power is called into question by a plaintiff who has suffered [an] Article III injury, courts consider the full range of the agency's asserted power, *even if the plaintiff has not been harmed by every aspect of the agency's congressionally unauthorized actions.*" As support for this broad proposition, the Plaintiffs cite two Supreme Court cases involving major questions. *See Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021); *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014). Neither case, however, supports the Plaintiffs' proposition.

No. 23-10284

In *Alabama Association of Realtors*, the Supreme Court held the Center for Disease Control and Prevention's ("CDC") eviction moratorium exceeded its statutory authority. 594 U.S. at 759–60. Although the Plaintiffs here concede that the moratorium applied to the plaintiffs in that case, they argue it supports their proposition because the Court discussed the penalties the CDC could impose on violators even though none of the plaintiffs suffered such a penalty. *Id.* at 764–65. There, the Court was discussing what the CDC itself said would be the penalties for moratorium violators in the order under review. *Id.* at 765 (citing 86 Fed. Reg. 43,244, 43,252 (Aug. 6, 2021)). Because the plaintiffs themselves would be subject to such penalties if they violated the order, the "application of the regulations by the Government [would] affect *them*" in a personal and concrete way. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (emphasis in original). Here, there is no indication that the Plaintiffs themselves have been or are likely to be subject to the Government's maintenance and use of the Watchlist apart from airport security.

In *Utility Air Regulatory Group*, the Supreme Court held that the Environmental Protection Agency ("EPA") exceeded its statutory authority by treating greenhouse gases as a "pollutant" under a statutory regime regulating the permit needs of certain emission sources. 573 U.S. at 325–26. At one point, the Court discussed the "numerous small sources not previously regulated" under the Clean Air Act, such as "large office and residential buildings, hotels, large retail establishments, and similar facilities," that the EPA predicted could be regulated if it chose to regulate greenhouse gases. *Id.* at 310 (quoting 73 Fed. Reg. 44,354, 44,498–99 (July 30, 2008)). The Plaintiffs here use this discussion to support their proposition because the Court "did not pause to ask whether the challenged regulations' effect" on the

previously unregulated entities "would injure petitioner Utility Air Regulatory Group."[9]

The Plaintiffs' reliance on this case, however, is misplaced. To start, the quoted discussion is the Court's review of the EPA's prior concerns over *possible* regulation of greenhouse gases articulated in an advanced notice of proposed rulemaking. *Id.* at 310. The discussion says nothing about the actual effects of the final rules the petitioners challenged. *See id.* at 311–13 (describing the final rules). More importantly, the Utility Air Regulatory Group members were subject to the challenged final rules because they were electric utilities. *See* 75 Fed. Reg. 31,514, 31,514 (June 3, 2010); Brief for Petitioner Utility Air Regulatory Group at x, *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) (No. 12-1146), 2013 WL 6512952, at *x. Although the Supreme Court did not address standing extensively, it concluded the petitioners had standing because the rules essentially imposed a new permitting regime for greenhouse gases discharged above an administratively created emissions threshold. *See Utility Air Regul. Grp.*, 573 U.S. at 325. This, the Court said, was an impermissible "rewriting of the statutory thresholds" that "went well beyond the bounds of [the EPA's] statutory authority." *Id.* at 325–26 (quotation marks and citation omitted).

Here, the Plaintiffs do not argue or suggest that they have been or are likely to be imminently injured by use of the Watchlist in situations unrelated to airport security. Accordingly, they lack standing to challenge the Government's use of the Watchlist in such circumstances. *See Summers*, 555 U.S. at 493–94. The cases they cite do not support the sweeping proposition that they can challenge *all* uses of the Watchlist because they are injured by only

---

[9] The Plaintiffs overlook the fact that there were numerous petitioners in that case, including several states. *Id.* at 313. Only one of the petitioners had to demonstrate standing to satisfy Article III. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

*one* of them. *Lewis*, 518 U.S. at 358 n.6. Indeed, "[i]t would be quite strange to think that a party experiences an Article III injury by *not* being affected by an unlawful action . . . or not being *more* affected by such action." *Department of Educ. v. Brown*, 600 U.S. 551, 564 (2023) (emphasis in original).

Our conclusion that the Plaintiffs have no standing as to the Watchlist uses unrelated to airport security should not be read as also implying a lack of statutory authority. We simply have no constitutional authority to review an issue for which no actual controversy is presented.

\* \* \*

The Government's creation, maintenance, and use of the Watchlist in screening passengers in commercial air travel does not exceed its statutory authority in violation of 5 U.S.C. § 706(2)(C). Because the Government's statutory authority in this case is unambiguous, we do not reach the issue of whether the major questions doctrine applies in this case.

AFFIRMED.